# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REV. JAMES S. FALLER, II and GARY S. VANDER BOEGH, Plaintiffs, v. U.S. DEPARTMENT OF JUSTICE, *et. al.*, Defendants. | Civil Action No. 20-1597 (ABJ) |

## MEMORANDUM OPINION

On June 12, 2020, *pro se* plaintiffs Rev. James S. Faller, II ("Faller") and Gary S. Vander Boegh ("Vander Boegh")[1] filed this action against the U.S. Department of Justice ("DOJ"), U.S. Department of Labor ("DOL"), U.S. Department of Energy ("DOE"), Internal Revenue Service ("IRS"), and Nuclear Regulatory Commission (collectively, "Federal Defendants"), the Commonwealth of Kentucky ("Kentucky"), and "Unk[n]own Actors." Compl. [Dkt. # 1]. Plaintiffs argue that defendants conspired to deprive them of their "constitutionally guaranteed civil rights, freedoms and properties" in violation of 42 U.S.C. §§ 1981, 1983, and 1985; 18 U.S.C. §§ 241, 242, and 1581(a–b); and the First, Fourth, Fifth, Sixth, and Eighth Amendments.[2] Compl. at 17–24. They seek various forms of relief, including declaratory judgments, permanent

---

[1]    Although Faller describes himself as a "practicing Autodidact lawyer," Compl. at 14, neither plaintiff is a licensed attorney, and the Court will afford both the benefit of the rules governing the consideration of *pro se* pleadings.

[2]    Plaintiffs mention additional statutes, such as the False Claims Act, 31 U.S.C. § 3729, and the Seventh and Fourteenth Amendments, in their jurisdictional statement. Compl. at 2–4. But they do not specifically predicate any of the eleven causes of action on those provisions.

injunctions, and compensatory and punitive damages.  Compl. at 21–24.  Faller claims defendants have caused him a "direct loss of more than $1.8 [b]illion [d]ollars," Compl. at 6, but there is no quantification of Vander Boegh's alleged damages.

The Federal Defendants and Kentucky have filed separate motions to dismiss all claims in the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Defs.' Mot. to Dismiss [Dkt. # 7] at 1; Def.'s Mot. to Dismiss [Dkt. # 13] at 1.  Defendants argue that the claims against them are barred by sovereign immunity, that the criminal statutes cited do not provide a private cause of action, and that none of the counts states a viable claim for relief.  *See* Mem. of P. & A. in Supp. of Fed. Defs. Mot. to Dismiss [Dkt # 7-1] ("Fed. Mot."); Mem. of P. & A. in Supp. of Kentucky's Mot. to Dismiss [Dkt # 13-1] ("KY Mot."); *see also* Defs.' Reply to Opp. [Dkt. # 18] ("Fed. Reply"); Def.'s Reply to Opp. [Dkt. # 19] ("KY Reply").  Kentucky also asserts that the federal courts should abstain from consideration of the claims seeking to enjoin pending state court actions.  KY Mot. at 7.  Plaintiffs have opposed the motion.  *See* Pls.' Opp. to Mot. [Dkt. # 17] ("Opp.").

On November 19, 2020, plaintiffs filed a motion to strike the motion to dismiss, an emergency motion for a temporary restraining order, a motion for preliminary injunction, a motion for hearing, and a motion for leave to file excess pages consisting of more than 1,700 exhibits. Pls.' Mot. to Strike [Dkt. # 9]; Pls.' Mots. for TRO, Preliminary Injunction, and Hearing [Dkt. # 10]; Pls.' Mot. to File Excess Pages [Dkt. # 11].  After denying plaintiffs' motion to strike, the Court deferred further briefing or consideration of plaintiffs' remaining motions until resolution of the pending motions to dismiss.  Min. Order (Nov. 20, 2020).  On April 5, 2021, plaintiffs filed another motion asking the Court to reconsider that decision.  Sealed Mot. to Reconsider Emergency Mot. for a Hearing for Temporary/Permanent Restraining Order [Dkt. # 22]

(SEALED).   For the reasons set forth below, the Court will **GRANT** defendants' motions to dismiss.  Because the complaint must be dismissed, plaintiffs' remaining motions will be **DENIED** as moot.

## BACKGROUND

The preamble to the complaint explains:

> The Plaintiffs have both a diverse and a common background.  In the end, both Plaintiffs have been attacked, deprived of multiple civil rights and robbed of assets and life.   The stated attacks, *infra*, are specific and intentional efforts to silence the Plaintiffs and break them from stopping the illicit activities, at times, out right criminal behavior of a multitude of actors.  The complained of, illicit activities have been specifically enabled by the Defendant's singular and combined actions and intentional inactions which have forced the Plaintiff's to seek judicial remedies.

Compl. at 6.

According to the complaint, plaintiff Faller is a "twenty-five year plus expert in fighting corruption," who has "provided services to Judges, Lawyers, Law Enforcement, and even the United States."  Compl. at 8; *see also* Compl. at 9 ("Faller began becoming high profile as an expert in fighting corruption and taking cases wrought with injustice, one even referred to him directly by former Attorney General Eric Holder that turned out to be a set up to attack Faller and frame him"), 14 ("Faller assists lawyers, Judges Law Enforcement, governments and clients in dealing with and fighting corruption").  He alleges that his efforts to expose wrongdoing have resulted in an unending series of "dangerous reactions":

> [H]e lost (2) two children and another was raped at four years old.  Faller was falsely charged some (6) six times to silence him.  Some of the events got so serious a sitting state Judge engaged in steps to have Faller assassinated.  Fortunately the government arrested the state Judge on RICO charges.

> In other instances, the Commonwealth of Kentucky engaged in actions to falsely charge Faller (4) four times. One (1) of those indictments still stands today from 2006.

Compl. at 8.

Plaintiff Vander Boegh is an engineer residing in West Paducah, KY, and former "licensed solid waste manager" of the Paducah Gaseous Diffusion Plant ("Paducah Plant") overseen by the DOE.  Compl. at 6–7, 14.  While working at the Paducah Plant approximately twenty years ago, plaintiff Vander Boegh allegedly discovered "illegal acts and intentional concealment of mishandling of highly lethal materials," including solid-waste materials contaminated with radioactive, transuranic elements.  Compl. at 6–7.

> The horrific effects of the transuranics ultimately polluted rivers, streams, land (including elementary schools[),] food crops and other places of human and animal exposure.  The result of the pollution began to reveal itself in the forms of child sicknesses (including deadly cancers and deformities[),] adults becoming sick with cancer, brain tumors and other deadly sicknesses, while animals in the region began mutating, including a deer that was seen with (2) two heads.

Compl. at 7.

The complaint alleges that the Paducah Plant exposed its employees, including plaintiff Vander Boegh, to "beryllium in sufficient quantity to cause them to contract *Chronic Beryllium Disease*, an irreversible, deadly medical condition that slowly kills the victim."  Compl. at 7 (emphasis in original) (footnote omitted).  Plaintiff Vander Boegh alleges that he was terminated for filing a complaint related to his discoveries, and that after his "departure from the site in 2004," he began helping "sick nuclear workers" initiate claims for their "work related illnesses."  Compl. at 7.

The two men met at a conference in approximately 2008, where plaintiffs "discovered they were fighting the same persons" and began to work together "surreptitiously."  Compl. at 8.  They joined efforts to help workers at the Paducah Plant – whom they refer to as their "clients" – obtain

their "statutorily guaranteed compensation" for "exposure and or injuries relating to toxic materials being illegally and negligently mishandled by the Defendants."  Compl. at 12, 16–17.

Thereafter, according to the plaintiffs, federal and state officials conspired to "silence, and if necessary, neutralize" them.  Compl. at 17.  They assert that "the Department of Justice and the Commonwealth of Kentucky took specific steps to prevent Faller or Vander Boegh from having ANY protection of law enforcement."  Compl. at 8 (emphasis in original).

As the two men "pushed harder for justice,"

> The Attorney General for the State of Kentucky issued a written moratorium which ordered the entire Justice Cabinet for the Commonwealth of Kentucky to deny help of any kind to Faller or anyone on his behalf.  At the same time, Commonwealth of Kentucky Officials took specific steps to interfere with Vander Boegh's ability to represent his clients and to slowly deprive him of his own personal wealth.

Compl. at 9.  Meanwhile, the complaint alleges, "DOJ, DOL and DOE, working on behalf of corrupt officials, concocted methods to deny Vander Boegh his legal rights and protections of law."  Compl. at 9.

The complaint goes on:

> As time continued, Faller created a way to make direct submissions to Grand Juries in Kentucky.  A federal Judge stepped in and changed the law of the land in the state of Kentucky to stop Faller.  This same Federal judge, later, was involved in and was complicit to abduction of a witness and willful perjury in a make believe trial against Faller.

Compl. at 9.  To stop Vander Boegh, the defendants would allegedly "manipulate records, cause Vander Boegh's lawyers to secretly work against his interests and prevent him from knowing of various legal events, all designed to deprive and or remove millions of dollars of assets and benefits that Vander Boegh either owned, or was a beneficiary of."  Compl. at 10.  And "[s]pecific steps were taken to continually interfere" with Faller's "substantial revenues and support," from sources including "members of a Royal Family in Europe."  Compl. at 10.

5

Plaintiffs allege that "[a]s Faller and Vander Boegh began closing in on the source and kind of the Kentucky corruption," Compl. at 10, federal and state officials engaged in a concerted effort to prevent plaintiffs from exposing defendants' "wrongful acts" and to deny compensation to plaintiffs' clients. Compl. at 16. They assert that "members of the Department of Justice worked with highly corrupt State of Kentucky Officials . . . to have Faller continually indicted." Compl. at 10. Faller was eventually convicted of tax evasion in a "kangaroo trial" in which "the Judge entered knowingly false testimony on behalf of a witness," and "a witness for the Defense was abducted by state officials to prevent her from testifying." Compl. at 11. "After Faller was falsely convicted . . . [he] was ordered to report to a prison camp where an effort was made to kill Faller in an accident. Faller was locked in the hole with no medical attention for months and finally released." Compl. at 11–12.

Meanwhile, "several corrupt officials began efforts to patently interfere with Vander Boegh, eventually physically assaulting him in a parking lot and concocting false charges against him in 2017." Compl. at 10. The complaint adds that the perpetrators of the assault possess video footage showing "the illicit assault was deliberate, planned and executed to stop Vander Boegh from representing a multitude of sick and dying workers." Compl. at 10. Also, the IRS, "a weaponized asset against foes of the government . . . attacked Vander Boegh with threats, false assessments and wrongful invoices," and raided Faller's office, seizing "a multitude of evidence [] that would have assisted Vander Boegh in securing statutorily guaranteed compensation for his clients." Compl. at 12.

There are many grievances detailed in the complaint, but plaintiffs emphasize that "[t]he overt acts of these [d]efendants are so numerous and widespread that there is no way to name them

all." Compl. at 17.  They summarize that some of the overt acts committed in furtherance of the

conspiracy include:

> [F]iling false charges; creating administrative remedies which make proving facts and claims impossible; physical assaults and arrests; filing false claims of tax liabilities; conspiring with representative lawyers in related and unrelated matters to deprive the Plaintiffs of wealth; holding kangaroo proceedings; failing to protect the constitutional rights of the Plaintiffs; failing to enforce laws and regulations designed to protect workers and public from radioactive isotopes; failing to provide the protections of law enforcement guaranteed under the Constitutions of the United States and the State of Kentucky; failing to protect the Plaintiffs from wrongful prosecutions; failure to protect the Plaintiffs from depravation of civil rights; knowingly entering false and deceitful data in official proceedings; refusing to comply with Code of Federal Regulations; Intentionally postponing investigations long past the point that damage or death takes place; issuing written moratoriums to deny any and all rights of the protections of law enforcement; combine, conspiring and confederating to engage in the above listed overt acts.

Compl. at 17.

Based on these allegations, plaintiffs have brought eleven claims:[3]

- Count I, based on 42 U.S.C. § 1983, alleges a conspiracy to deprive plaintiffs of their constitutionally guaranteed civil rights.

- Count II, based on 42 U.S.C. § 1985 and 18 U.S.C. §§ 241 and 242, also alleges a conspiracy to deprive plaintiffs of their constitutionally guaranteed civil rights.

- Count III, based on 18 U.S.C. § 1581 and 42 U.S.C. §§ 1983 and 1985, alleges a conspiracy "to place the Plaintiff and a multitude of others in a state of Peonage."

- Count IV alleges a conspiracy to deprive plaintiffs "of their constitutionally guaranteed civil rights, freedoms and properties in violation [of] 18 U.S.C. § 242."

- Count V also alleges a conspiracy to deprive plaintiffs "of their constitutionally guaranteed civil rights, freedoms and properties," but it is based on 42 U.S.C. § 1981.

- Count VI, based on 42 U.S.C. § 1985 and 18 U.S.C. § 241, alleges that defendants conspired "to create a culture, pattern of conduct and environment of pure and

---

3       Plaintiffs use bold for emphasis throughout the counts; the Court has omitted the bolding when quoting the complaint.

unadulterated terror" by "ordering a complete moratorium of the protections of law enforcement and protection of the laws" insofar as plaintiffs were concerned.

▪ Count VII alleges a conspiracy to deprive plaintiffs of constitutional rights in which defendants violated the Fourth, Fifth, Sixth, and Eighth Amendments as part of a "design[] to deprive the Plaintiff's . . . of their Constitutionally guaranteed, First Amendment Right of Free Speech."

▪ Count VIII, based on 18 U.S.C. § 241 and 42 U.S.C. § 1985, alleges a conspiracy to "intentionally obstruct[] legal judicial processes."

▪ Count IX alleges a conspiracy to intentionally obstruct legal judicial processes in violation of the First Amendment.

▪ Count X alleges a conspiracy to engage in acts preventing the plaintiffs from being protected by the rule of law in violation of the Eighth Amendment, offering as an example "Faller has been tortured by keeping him under False charges . . . in Kentucky." Count X adds that this is designed to silence Faller and violate his First Amendment rights.

▪ Count XI alleges defendants conducted "three falsely concocted raids on Plaintiff Faller against the Fourth Amendment of the United States Constitution in an effort to further false and malicious civil and state prosecutions."

*See* Compl. at 17–21.

## STANDARDS OF REVIEW AND LEGAL BACKGROUND

### Subject Matter Jurisdiction

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction."). "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## Sovereign Immunity

When a case is brought against a governmental entity, an essential aspect of the jurisdictional analysis is whether that entity may be sued at all.  "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  The United States and its agencies are immune from suit in their official capacities unless Congress has expressly waived the defense of sovereign immunity by statute. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Albrecht v. Comm. on Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67 (D.C. Cir. 2004) ("[f]ederal agencies or instrumentalities performing federal functions always fall on the 'sovereign' side of [the] fault line; that is why they possess immunity that requires waiver."). Consent may not be implied; it must be "unequivocally expressed." *United States v. 116 Nordic Vill., Inc.*, 503 U.S. 30, 33–34 (1992).  A waiver of immunity is strictly construed in favor of the sovereign. *Orff v. United States*, 545 U.S. 596, 601–02 (2005).  "A plaintiff must overcome the

defense of sovereign immunity in order to establish the jurisdiction necessary to survive a Rule 12(b)(1) motion to dismiss." *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006), citing *Tri–State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).

States receive sovereign immunity under the Eleventh Amendment.  Absent a waiver, the Eleventh Amendment renders a state "immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Morris v. WMATA*, 781 F.2d 218, 222–23 (D.C. Cir. 1986), citing *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974).  A waiver arises when a state consents to suit or Congress abrogates the state's immunity.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99–100 (1984); *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55 (1996) ("Congress may abrogate states' sovereign immunity if it has 'unequivocally expresse[d] its intent to abrogate the immunity' and has acted 'pursuant to a valid exercise of power.'"), quoting *Green v. Mansour,* 474 U.S. 64, 68 (1985).  Although "the immunity is one of the state, 'some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'"  *Morris* at 223, quoting *Lake Country. Ests. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 400–01 (1979).  Moreover, this immunity applies to claims premised on constitutional rights, *Alabama v. Pugh*, 438 U.S. 781 (1978), and seeking relief beyond monetary compensation.  *Cory v. White*, 457 U.S. 85, 91 (1982) ("limiting the strictures of the Eleventh Amendment to a suit for a money judgment[] would ignore the explicit language and contradict the very words of the Amendment itself.").[4]

---

4      Plaintiffs did not respond to defendants' arguments regarding sovereign immunity, but since plaintiffs are *pro se* and sovereign immunity involves the Court's jurisdiction, the Court will analyze the issue and not treat the matter as conceded.

**Failure to State a Claim**

Once a court is satisfied of its jurisdiction, it may proceed to assess the strength of the allegations.  "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 678–79, quoting *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678, citing *Twombly*, 550 U.S. at 556.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*, quoting *Twombly*, 550 U.S. at 556.  A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6) or Rule 12(b)(1),  the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged."  *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler v. United States*, 617 F.2d 605,608; *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005) (applying principle to a Rule 12(b)(1) motion).  Nevertheless,

the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (rule 12(b)(6) case); *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (rule 12(b)(1) case).

When an action is brought by a *pro se* plaintiff, a district court has an obligation "to consider his filings as a whole before dismissing a complaint," *Schnitzler v. United States*, 761 F.3d 33, 38 (D.C. Cir. 2014), citing *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999), because such complaints are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See Kowal*, 16 F.3d at 1276; *see also Browning*, 292 F.3d at 242.  In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

I.     **Count I fails because 42 U.S.C. § 1983 does not support an action against the Federal Defendants or Kentucky.**

Count I alleges that defendants "did in fact combine, conspire and confederate to deprive the Plaintiffs, jointly and individually for illicit purposes to deprive them of their constitutionally guaranteed civil rights in violation of 42 U.S.C. § 1983."  Compl. at 17.

Section 1983, enacted as part of the Civil Rights Act of 1871, provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Since the statute applies only to those acting under color of state law, the law is clear that section 1983 cannot be the basis for an action against the federal government or a federal official, *see, e.g.*, *Abramson v. Bennett,* 707 F. Supp. 13, 16 (D.D.C. 1989), *aff'd* 889 F. 2d 291 (D.C. Cir. 1989), and thus, the statute does not serve as the necessary waiver of sovereign immunity. *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005) (The United States and its agencies have not waived immunity under section 1983).[5]

Moreover, the statute created a cause of action against a "person" who violates another's constitutional rights, and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). *See also Iqbal,* 556 U.S. at 676 (2009) (In a section 1983 lawsuit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Under those circumstances, plaintiffs have not pointed the Court to any provision of state or federal law that would waive Kentucky's sovereign immunity. *See Edelman v. Jordan*, 415 U.S. 651, 676–77 (1974) ("[section] 1983 was [not] intended to create a waiver of a State's Eleventh Amendment immunity merely because an action could be brought under that section against state officers, rather than against the State itself."); *see also Kentucky v. Graham*, 473 U.S.

---

5       This would also require the dismissal of any claims in Count 1 against any unknown individual federal actors.

159, 171 (1985) (holding that the state of Kentucky's sovereign immunity under section 1983 barred plaintiffs' claim of attorneys' fees, even though plaintiffs prevailed against state officials in their personal capacity).

For these reasons, the Court will dismiss Count I against the Federal Defendants and the Commonwealth of Kentucky under Fed. R. Civ. Proc. 12(b)(1).[6]

## II. Counts II, IV, VI, and VIII fail because 42 U.S.C. § 1985 does not waive sovereign immunity and 18 U.S.C. §§ 241 and 242 do not give rise to a private right of action.

### A. Section 1985

Section 1985 prohibits three forms of interference with civil rights:

> (1) Preventing officer from performing duties

> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof . . . ;

> (2) Obstructing justice; intimidating party, witness, or juror

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, . . . , or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property . . . ; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

> (3) Depriving persons of rights or privileges

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal

---

6    Unknown individual state actors will be addressed in Section V of this opinion below.

> protection of the laws . . . ; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner . . . ;

It further provides that a person who is injured by any act in furtherance of a conspiracy described in the section, or who through such a conspiracy was "deprived of having and exercising any right or privilege of a citizen of the United States," may bring "an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

Count II cites section 1985(3) and asserts that defendants "did in fact combine, conspire and confederate to deprive the Plaintiffs, jointly and individually for illicit purposes to deprive them of their constitutionally guaranteed civil rights." Compl. at 18.

It is clear from the recitation of the provisions proscribing acts by "two or more persons in any State or Territory," and the conclusion authorizing an injured person to bring a lawsuit against those co-conspirators, that section 1985 does not create a cause of action against agencies of the federal government. For that reason, as with section 1983 and the other sections of the Civil Rights Act, courts have consistently held that the United States and its agencies have not waived sovereign immunity under section 1985. *See Hohri v. United States*, 782 F.2d 227, 245 n.43 (D.C. Cir. 1986) (§§ 1981, 1985, and 1986 "by their terms, do not apply to actions against the United States"), *vacated on other grounds*, 482 U.S. 64 (1987); *Unimex, Inc. v. HUD*, 594 F.2d 1060, 1061 (5th Cir. 1979) (sovereign immunity not waived under the civil rights statutes, §§ 1981, 1983, 1985, and 1986).

Section 1985 claims also must be dismissed against the Commonwealth of Kentucky because courts have not found an "unequivocal expression of congressional intent," *Pennhurst*,

465 U.S. at 99, in section 1985 that would abrogate the Eleventh Amendment.  *See Quern v.*
*Jordan*, 440 U.S. 332, 342 (1979) (emphasizing "that Congress [did not intend] by the general
language of the [Civil Rights Act of 1871] to overturn the constitutionally guaranteed immunity
of the several States.").

### B.  There is no private right of action under 18 U.S.C. §§ 241, 242.

Count II alleges that defendants conspired to deprive the plaintiffs of their constitutional
rights in violation of 18 U.S.C. §§ 241 and 242 in addition to section 1985.  Compl. at 18.

Section 241 states:

> If two or more persons conspire to injure, oppress, threaten, or intimidate
> any person in any State, Territory, Commonwealth, Possession, or District
> in the free exercise or enjoyment of any right or privilege secured to him by
> the Constitution or laws of the United States, or because of his having so
> exercised the same; or
>
> If two or more persons go in disguise on the highway, or on the premises of
> another, with intent to prevent or hinder his free exercise or enjoyment of
> any right or privilege so secured—
>
> They shall be fined under this title or imprisoned not more than ten years,
> or both . . .

Section 242 provides:

> Whoever, under color of any law, statute, ordinance, regulation, or custom,
> willfully subjects any person in any State, Territory, Commonwealth,
> Possession, or District to the deprivation of any rights, privileges, or
> immunities secured or protected by the Constitution or laws of the United
> States, or to different punishments, pains, or penalties, on account of such
> person being an alien, or by reason of his color, or race, than are prescribed
> for the punishment of citizens, shall be fined under this title or imprisoned
> not more than one year, or both . . .

These two provisions of Title 18 are criminal statutes, and they do not on their face
authorize the bringing of a civil action by a private party.  "Like substantive federal law itself,
private rights of action to enforce federal law must be created by Congress."  *Alexander v.*

*Sandoval*, 532 U.S. 275, 286 (2001).  "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Id.*  If Congress did not intend to create a private cause of action, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87.

Courts generally decline to "infer a private right of action from 'a bare criminal statute.'" *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190 (1994), quoting *Cort v. Ash*, 422 U.S. 66, 80 (1975).  So, though "provision of a criminal penalty does not necessarily preclude implication of a private cause of action for damages," *Cort*, 422 U.S. at 79, in practice courts have "rarely implied a private right of action under a criminal statute." *Lee v. United States Agency for Int'l Dev.*, 859 F.3d 74, 77 (D.C. Cir. 2017), quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979).

In considering whether to imply a private right of action, courts consider four factors:

> First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort*, 422 U.S. at 78 (citations and internal quotation marks omitted).

The D.C. Circuit has already determined that the general principle – that criminal statutes do not imply private rights of action – holds true with regards to sections 241 and 242.  *See Crosby v. Catret*, 308 F. App'x 453 (D.C. Cir. 2009) (unpublished) ("The district court properly rejected appellant's attempt to invoke 18 U.S.C. § 241 and 18 U.S.C. § 242 to initiate a prosecution against

the named defendants because there is no private right of action under these criminal statutes."), citing *Cok v. Cosentino*, 876 F.2d 1, 2 (1st Cir. 1989); *Cok*, 876 F.2d at 2 ("Only the United States as prosecutor can bring a complaint under 18 U.S.C. §§ 241–242 . . . .  These statutes do not give rise to a civil action for damages.") (citations omitted); *see also Henry v. Albuquerque Police Dep't*, 49 F. App'x 272, 273 (10th Cir. 2002) (unpublished) (pursuant to "settled law," sections 241 and 242, "like other such statutes, do not provide for a private civil cause of action") (citations omitted).  Moreover, as the First Circuit pointed out in *Cok*, 876 F.2d at 2, the existence of a direct civil analogue implies that Congress did not intend for these criminal statutes to also provide a civil remedy, and that to infer one would be inconsistent with the larger statutory scheme.

In light of this circuit precedent and the persuasive rulings of other courts, and in the absence of any argument by plaintiffs to the contrary, Count II must be dismissed against all defendants, federal or state, known or unknown, insofar as it is based on the two sections of Title 18.

Given these findings with respect to Count II, several other counts fall in their entirety.

Count IV, also alleging a conspiracy to deprive the plaintiffs of their civil rights, is based solely on section 242, and therefore, it will also be dismissed.

Count VI, which alleges that the defendants conspired to deprive them of their constitutional rights and "to create a culture, pattern of conduct and environment of pure and unadulterated terror for anyone . . . and to have extreme fear and terror of retaliation by the Defendants and others who have adopted their illicit methods to Oppress, Silence, Hinder and Obstruct any lawful adversary," Compl. at 19, and Count VIII, which alleges that the defendants conspired to deprive them of their constitutional rights by "intentionally obstructing legal

processes," Compl. at 19, are predicated on the combination of 42 U.S.C. § 1985 and 18 U.S.C. § 241, and therefore, like Count II, they will also be dismissed.

### III.   Count III fails because 18 U.S.C. § 1581 does not create a private right of action.

Count III alleges that defendants conspired to deprive plaintiffs of "their constitutionally guaranteed civil rights in acts of Civil Rights violations against the Plaintiffs to place the Plaintiff and a multitude of others in a state of Peonage." Compl. at 18. It is based on 42 U.S.C. §§ 1983 and 1985, which do not supply jurisdiction for the reasons stated above, and it is also predicated on 18 U.S.C. § 1581.

Section 1581 criminalizes holding a person in a state of peonage, or a "condition of compulsory service, based upon indebtedness of the peon to the master." *United States v. Reynolds,* 235 U.S. 133, 144 (1914); *Clyatt v. United States,* 197 U.S. 207, 215 (1905). The crime of peonage requires two fundamental elements: (1) that the victim is coerced to work against their will, and (2) to discharge a debt they owe. *See Reynolds,* 235 U.S. at 144 ("we must determine whether the [victim] was in reality working for a debt which he owed the [master], and [] the labor was performed under such coercion as to become compulsory service for the discharge of the debt."); *see also Pierce v. United States,* 146 F.2d 84, 86 (5th Cir. 1944) (victim must prove that she is held against her will and forced to work to satisfy a debt).

Putting aside the problem that plaintiffs have not included any facts in their complaint that would support an inference that they were bound to any defendant, named or unnamed, in indentured servitude, they have not established that the criminal provision creates a private cause of action. Plaintiffs have not pointed to any legislative history indicating an intent to create a civil remedy, nor have they demonstrated that they belong to a "class for whose especial benefit the

statute was enacted,"[7] or how a private right of action would be consistent with the larger legislative scheme.  *See Cort*, 422 U.S. at 78.

And while the D.C. Circuit has yet to address whether 18 U.S.C. § 1581 contains a private right of action, many other courts have held that this criminal statute does not give rise to a private right of action.  *See, e.g.*, *Eddins v. Summers*, 23 F. App'x 221, 223 (6th Cir. 2001) (finding plaintiff's section 1581 claim frivolous because plaintiff was "not authorized to initiate criminal prosecutions"); *Partin v. Gevatoski*, No. 6:19-CV-1948-AA, 2020 WL 4587386, at *3 (D. Or. Aug. 10, 2020) (dismissing plaintiff's section 1581 claim on grounds that "[f]ederal criminal statutes [] do not provide a basis for a private cause of action"), quoting *Frost v. Robertson*, No. CV06-174-S-BLW, 2009 WL 735690, at *16 (D. Idaho Mar. 19, 2009); *Dolla v. Unicast Co.*, 930 F. Supp. 202, 205 (E.D. Pa. 1996) (no private right of action under section 1581 "because it is a criminal statute and because there is no evidence that Congress intended to extend application of § 1581 to the civil context.").  The Court finds this unanimity to be instructive and persuasive, and having not been presented with any arguments to the contrary, this Court will also decline to infer a private right of action from this criminal statute.

As a result, section 1581 cannot form the basis of plaintiffs' claims, and it follows that Count III must be dismissed against all defendants, known or unknown.

## IV.   Count V also fails due to sovereign immunity.

---

7       The Supreme Court has noted that merely alleging that a crime was committed against you is insufficient to show that a plaintiff belongs to a special class of intended beneficiaries; "[e]very criminal statute is designed to protect some individual, public, or social interest. . . .  To find an implied civil cause of action for the plaintiff in this case is to find an implied civil right of action for every individual, social, or public interest which might be invaded by violation of any criminal statute.  To do this is to conclude that Congress intended to enact a civil code companion to the criminal code."  *Cort*, 422 U.S. at 79 (citation omitted).

Count V alleges that the defendants conspired "for illicit purposes" to deprive them of their constitutionally guaranteed civil rights in violation of 42 U.S.C. § 1981.  This provision of the Civil Rights Act relates to the right to enter into contracts, and it states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.  But as noted in section II(A) above, courts have held that Congress did not waive the sovereign immunity of the United States and its agencies or instrumentalities when it enacted this set of provisions.  *See Hohri v. United States*, 782 F.2d at 245 n.43; *see also Unimex*, 594 F.2d at 1061 (no waiver of federal sovereign immunity).  The same applies to the states.  *See Quern*, 440 U.S. at 342 (Civil Rights Act of 1871 did not "overturn the constitutionally guaranteed immunity of the several States"); *Thompson v. WMATA*, No. 01-7026, 2001 WL 1154420, at *1 (D.C. Cir. Aug. 9, 2001) (Affirming that Eleventh Amendment immunity applies to states and arms of the state and has not been waived under § 1981).

Accordingly, the Court will dismiss Count V.

## V.   Counts VII, IX, X, and XI do not state *Bivens* claims for violations of plaintiffs' First Amendment rights.

Counts VII, IX, X, and XI all arise out of plaintiffs' allegations that the defendants went to great lengths to use illegal means to silence them.

Count VII alleges that defendants conspired to commit a series of constitutional violations that deprived plaintiffs of civil rights guaranteed by the Fourth, Fifth, Sixth, and Eighth Amendments, "all designed to deprive the plaintiffs of their Constitutionally guaranteed, First Amendment Right of Free Speech."  Compl. at 19.

Count IX alleges a conspiracy to violate plaintiffs' First Amendment rights "by refusing to and intentionally obstructing legal judicial processes."  Compl. at 20.

Count X alleges that defendants violated plaintiffs' Eighth Amendment rights by torturing Faller and bringing a series of false indictments against him starting in 2002, all "designed to silence Faller and violate his First Amendment, Free Speech Rights."  Compl. at 20.

And Count XI asserts that defendants conspired to deprive the defendants of their civil rights by "conducting three falsely concocted raids on Plaintiff Faller against the Fourth Amendment . . . in an effort to further false and malicious civil and state prosecutions and to remove and dispose of the valid defenses to the false charges . . . where the defendants failed to provide legitimate, law abiding . . . Courts and redress, protected under the First Amendment." Compl. at 19–21.

In *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),[8] the Supreme Court recognized a private cause of action against individual federal officials who violated the claimant's constitutional rights while acting in their individual capacity under color of federal law.  *See Simpkins v. District of Columbia*, 108 F.3d 366, 369 (D.C. Cir. 1997) (holding that *Bivens* action governs only federal officials acting in their private capacities).  This means that none of the claims could be brought against the United States itself or the federal agencies that are named as defendants here, *see Meyer*, 510 U.S. at 486 (the United States has not consented to be sued for monetary damages based on a constitutional violation or, in other words, for a "*Bivens*-type cause of action directly against a federal agency."), and none could be brought

---

8        Though plaintiffs do not mention *Bivens* in their counts, they do style the complaint as a *Bivens* action in their jurisdictional statement.  *See* Compl. at 2 ("this controversy and Bivens action . . ."").  Given that courts must read the complaint as a whole, *see Schnitzler*, 761 F.3d at 38, and that they must take care to liberally construe *pro se* complaints, the Court assumes that the counts alleging Constitutional violations were intended as *Bivens* claims.

against the Commonwealth of Kentucky or even any individual state actor.  *See Butz v. Economou,* 438 U.S. 478, 504 (1978) ("the decision in *Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible *federal* official.") (emphasis added).

Moreover, "*Bivens* actions are for damages," for which the defendant is personally responsible.  *Simpkins,* 108 F. 3d at 369; *see also Davis v. Passman*, 442 U.S. 228, 245 (1979) (implying a cause of action and a damages remedy from the Fifth Amendment and noting that under *Bivens*, "it is damages or nothing.") (citation and internal quotation marks omitted).  So, none of these counts could support plaintiffs' claims for injunctive relief.

Therefore, the only question that remains is whether any of the four counts state a valid *Bivens* claim for damages against an individual federal official.

But not one of these counts even purports to sue an individual federal officer in his personal capacity.  No individual federal officer or employee has been named as a defendant or mentioned in any of these counts.  This leaves only the undifferentiated set of "unknown actors" included in the caption of the case.  Even if one can infer that plaintiffs meant to include some federal agents in that category, that is not sufficient to sustain Counts VII, IX, X, and XI.

No motion to dismiss has been filed on behalf of the "unnamed actors."  However, the D.C. Circuit has stated that a "district court may *sua sponte* dismiss a claim pursuant to Rule 12(b)(6) without notice where it is 'patently obvious' that the plaintiff cannot possibly prevail based on the facts alleged in the complaint."  *Rollins v. Wackenhut Servs., Inc.*, 703 F.3d 122, 127 (D.C. Cir. 2012), quoting *Baker v. Dir., U.S. Parole Comm'n*, 916 F.2d 725, 727 (D.C. Cir. 1990).  The Court will take that step here.

The plaintiffs' first problem is that a *Bivens* action is a judicially-created remedy, which arose in the context of a Fourth Amendment violation, and therefore, courts have cautioned that it should be construed narrowly, and they have been reluctant to extend the doctrine to other alleged constitutional violations.   In *Loumiet v. United States*, the D.C. Circuit confirmed that not all alleged Constitutional violations are cognizable as *Bivens* causes of action, and it specifically declined to imply the existence of a damages action under the First Amendment because, "in the decades since *Bivens* was decided, the [Supreme] Court has grown wary of creating implied damages actions in other contexts."  948 F.3d 376, 381 (D.C. Cir. 2020), cert. denied, 141 S. Ct. 180 (2020), citing *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855–56 (2017).[9]

Here, Count IX is a would-be *Bivens* claim predicated directly on the First Amendment, so it must be dismissed as to any defendant under *Loumiet*.

The other counts invoke other constitutional provisions, but it appears that those violations are alleged to be the means by which the defendants deprived the plaintiffs of their First Amendment rights.  Count VII alleges that defendants conspired to deprive the plaintiffs of their civil rights in violation of the Fourth, Fifth, Sixth, and Eighth amendments, but it concludes with an assertion that these actions were "all designed to deprive the Plaintiff's . . . of their Constitutionally guaranteed, First Amendment Right of Free Speech."  Compl. at 19.  Similarly, Count X alleges that defendants conspired to deprive the plaintiffs of their rights "in violation of the Eighth Amendment Rights to be free of Cruel and Unusual Punishment," Compl. at 20, and

---

9    This observation is not unique to the First Amendment; for example, when considering whether a *Bivens* action could be brought under the Eighth Amendment, the Supreme Court recently held that the availability of a claim may depend on whether an individual was incarcerated in a government facility or a private prison.  *See Minneci v. Pollard*, 565 U.S. 118, 125 (2012) (when a claim is brought against "a privately employed defendant, state tort law provides an alternative, existing process capable of protecting the constitutional interests at stake").

explains that "[i].e., Faller has been tortured by keeping him under false charges . . . in Kentucky starting in 2002 designed to silence Faller and violate his First Amendment, Free Speech Rights. Compl. at 20. Thus, even reading the complaint fairly to give plaintiffs the benefit of the doubt, one could conclude that Counts VII and X are barred by *Loumiet* as well.

Count XI alleges that the defendants conducted "three falsely concocted raids on Plaintiff Faller against the Fourth Amendment of the United States Constitution," but that count also asserts that they did so "to further false and malicious civil and state prosecutions and to remove and dispose of the valid defenses to the false charges of the Defendants where the Defendants failed to provide legitimate . . . Courts and redress, protected under the First Amendment of the United States Constitution." Compl. at 20–21. This may also create a problem for plaintiffs under *Loumiet*.[10]

But even if one were inclined to assess the sufficiency of the allegations of violations under other amendments, the complaint fails to state any cognizable cause of action under *Bivens* against any unknown federal actor, and Counts VII, IX, X, and XI, must be dismissed under Rule 12(b)(6). The claims are entirely conclusory, and none ascribes any particular wrongdoing at any particular time or place to any federal official, much less, one acting in his individual capacity.

While the plaintiffs included "unknown actors" in the list of defendants in the caption of the lawsuit, they did not include a single factual allegation about them in the remainder of the

---

[10]    The emphasis on the First Amendment may arise from concerns that the Fourth or Eighth Amendment claims would likely run into additional hurdles. For example, there is a "three-year limitations period in . . . most *Bivens* actions," *Banks v. Chesapeake & Potomac Tel. Co.*, 802 F.2d 1416, 1429 (D.C. Cir. 1986), and the acts that implicate the Fourth Amendment most directly took place more than ten years ago. *See, e.g.*, Compl. at 11 ("twenty, heavily armed IRS agents raided Faller's home and office" in November 2010). And according to the complaint, Faller's conviction and sentencing was in a federal tax case brought in 2013, Compl. at 12, and his allegations have already been the subject of a federal civil rights action that was brought in West Virginia in 2018, so there may be *res judicata* issues.

complaint.  On pages 14–16, where plaintiffs describe each defendant in separately numbered paragraphs, they omit the "unknown actors" entirely.  None of the individual counts make reference to any "unknown actor"; each simply purports to be brought against "the above-named defendants."  So the Court has no way of knowing which claim is supposed to be against which actor.  And at no point does the complaint lay out what any particular "unknown actor" is alleged to have done, whether they are a state or federal official (or a government official at all), whether they acted in their official or personal capacity, where they are located and why the Court might have personal jurisdiction over them, and what they may have done to either plaintiff.  In sum, the problem is not that the plaintiffs do not identify alleged wrongdoers by name; the problem is that the complaint is too vague and too conclusory to state a plausible claim against *any* individual actor, even one whose name is unknown and must be referred to as "John Doe."  *See Iqbal*, 556 U.S. at 681 (plaintiffs must assert more than "bare assertions" that "amount to nothing more than a formulaic recitation of the elements of a constitutional discrimination claim") (internal quotation marks and citation omitted).

Therefore, Counts VII, IX, X, and XI will be dismissed.[11]

---

11      This leaves the Court with no claim against any unknown actor.  Since the Court has ruled that 18 U.S.C. §§ 241, 242, and 1581 will not support a civil claim against any defendant, there is no need to address the strength of the allegations against unknown actors in Count IV; Counts II and VI insofar as they are based on section 241 or 242; or Count III insofar as it is based on section 1581.

Count One is brought under 42 U.S.C. § 1983, as is Count III, in part.  Plaintiffs invoke 42 U.S.C. §§ 1981 and 1985 in Counts II, V, and VI.  Given the discussion of those statutes above, none of those counts can sustain an action against an individual federal agent or official.

Section 1983 claims can be brought against individual state officials and even private individuals, *see Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute."), and claims under sections 1981 and 1985 of the Civil Rights statute can also be brought against individuals.  *See, e.g., Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,

## IV.     The *Younger* abstention doctrine bars relief related to a pending state criminal case.

The complaint alleges that "the Commonwealth of Kentucky engaged in actions to falsely charge Faller four times.  One of those indictments still stands today from 2006."  Compl. at 8.  In the "Relief Sought" section of the complaint, plaintiffs request, among other things, a declaratory judgement stating that "the pending 2006 indictment of Commonwealth of Kentucky v. James Faller 06-CR-00101 & 102" is a constitutional violation of "Faller's rights to a fair and speedy trial" and is "designed to obstruct and interfere" with his First Amendment and other statutory rights.  Compl. at 22.  Plaintiffs also reference the pendency of the criminal case as grounds for relief in Count X (complaining that defendants "intentionally obstruct[ed] legal judicial processes" and "tortured [Faller] by keeping him under false charges (via (4) four illicit indictments, one of which has been pending for (14) fourteen years") and Count XI (alleging that the unconstitutional "raids" were "an effort to further false and malicious civil and state prosecutions.").

These counts must be dismissed for other reasons, as previously explained.  But insofar as plaintiffs ask the Court to grant relief that would in some way impact the ongoing criminal proceedings involving Faller, the claims also must be dismissed pursuant to *Younger v. Harris*,

---

140 S. Ct. 1009, 1016 (2020) ("§ 1981 was designed to eradicate blatant deprivations of civil rights, such as where a private offeror refused to extend to an African-American, because he is an African-American, the same opportunity to enter into contracts as he extends to white offerees.") (internal quotation marks and brackets omitted); *Ziglar*, 137 S. Ct. at 1865 (§ 1985 claim "implicate[d] the activities of all the petitioners—the Executive Officials as well as the Wardens").

But even if plaintiffs intended to bring these claims against any unknown individual, whether a private citizen or a state official – and there is no indication that they did – the same lack of specificity that prevents the Court from finding that plaintiffs have stated a *Bivens* action against an unknown individual federal official would doom these claims as well.  The complaint fails to spell out what was allegedly done by any individual state actor that would give rise to a plausible inference that they are liable for a violation of plaintiffs' civil rights.  Therefore, all of the counts in the complaint must be dismissed against the defendant unknown actors for failure to state a claim under Rule 12(b)(6).

401 U.S. 37, 41 (1971).  In *Younger*, the Supreme Court announced that principles of equity and comity require the federal courts to abstain from intervention in pending state proceedings when three criteria are met:  (1) there are ongoing state proceedings that are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the proceedings afford an adequate opportunity to raise the federal claims.  *Bridges v. Kelly*, 84 F.3d 470, 476 (D.C. Cir. 1996), citing *Hoai v. Sun Ref. Mktg. Co.*, 866 F.2d 1515, 1518 (D.C. Cir. 1989).   Ongoing state criminal prosecutions meet all three criteria.  *Kugler v. Helfant*, 421 U.S. 117, 123 (1975), citing *Younger*, 401 U.S. at 46 ("In *Younger v. Harris* [] and its companion cases, the Court reexamined the principles governing federal judicial intervention in pending state criminal cases, and unequivocally reaffirmed 'the fundamental policy against federal interference with state criminal prosecutions.'").   In sum, as the Supreme Court has reiterated, "*Younger* preclude[s] federal intrusion into ongoing state criminal prosecutions."  *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78 (2013), citing *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 (1989).   Thus, the Court must also dismiss plaintiffs' claims insofar as they seek to interfere with ongoing state criminal prosecutions.[12]

---

[12]     There is an exception to the *Younger* doctrine when an enforcement action is brought "in bad faith without hope of obtaining a valid conviction."  *Perez v. Ledesma*, 401 U.S. 82, 85 (1971). However, this exception is to be rarely applied; "[o]nly if 'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it, can there be any relaxation of the deference to be accorded to the state criminal process."  *Kugler v. Helfant*, 421 U.S. at 124.  While the complaint is replete with allegations of bad faith, plaintiffs have not argued that this exception applies, and in any event, there is no count that has survived scrutiny under Rules 12(b)(1) and 12(b)(6).

## <u>CONCLUSION</u>

For the foregoing reasons, the Federal Defendants' motion to dismiss and Kentucky's motion to dismiss will be **GRANTED**.  With the termination of the case, plaintiffs' pending motions are **DENIED** as moot.

A separate order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 17, 2021